**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------
                                :
HABIB NASRALLAH,                :
                                :   Civil Action No. 06-527 (FSH)
          Petitioner,           :
                                :
     v.                         :       O P I N I O N
                                :
DISTRICT DIRECTOR ANDREA        :
QUARANTILLO, et al.,            :
                                :
          Respondents.          :
---------------------------------

**APPEARANCES:**

    HABIB NASRALLAH, Petitioner, Pro Se
    #168135
    Hudson County Correctional Facility
    35 Hackensack Avenue
    South Kearny, New Jersey 07032

    CHRISTOPHER J. CHRISTIE, United States Attorney
    JOHN G. SILBERMANN, Assistant U.S. Attorney
    970 Broad Street, Suite 700
    Newark, New Jersey  07102
    Attorneys for Respondents

**HOCHBERG, District Judge**

Petitioner, Habib Nasrallah ("Nasrallah"), is currently being detained by the Department of Homeland Security ("DHS"), Bureau of Immigration and Customs Enforcement ("BICE") at the Hudson County Correctional Facility in South Kearny, New Jersey, pending his removal from the United States.  By Order filed on February 3, 2006, the United States District Court for the Eastern District of New York transferred Nasrallah's Petition for

Writ of Habeas Corpus under 28 U.S.C. § 2241, in which he challenges his continuing detention as unlawful and unconstitutional, to the District of New Jersey because petitioner is detained in New Jersey.

The named respondents are the Attorney General of the United States; District Director Andrea Quarantillo, Immigration and Customs Enforcement ("ICE") in New Jersey; and District Director Mary Ann Gantner, ICE New York.[1]  The Government filed an Answer to the petition on April 3, 2006, with a certified copy of the relevant administrative record.  Nasrallah filed an opposition to the respondents' Answer, and the ICE's recommendation to continue detention, on or about April 10 and 17, 2006.

## BACKGROUND

Nasrallah is a native and citizen of Lebanon, who entered the United States in October 1992.  Because Nasrallah did not appear to be clearly entitled to enter the U.S., he was placed in exclusion proceedings.  Nasrallah conceded his excludability under Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA").  On or about August 18, 1993, Nasrallah

---

[1] Effective March 1, 2003, the Immigration and Naturalization Service ("INS") ceased to exist as an agency of the Department of Justice, and its functions were transferred to the Department of Homeland Security ("DHS").  See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  The Bureau of Immigration and Customs Enforcement of the DHS is responsible for the interior investigation and enforcement functions that formerly were performed by the INS.

filed an application for asylum with the INS. The request for asylum and withholding of removal from the United States was denied by an Immigration Judge ("IJ") on June 19, 1995. Thereafter, Nasrallah filed several applications for adjustment of status based on marriages that later failed. These applications were denied. The last denial occurred on November 2, 2004.[2] (AR24-27; AR30-45; AR49;AR50-55).

On July 13, 2005, Nasrallah was taken into custody by the New York City Fugitive Operations Unit and was remanded to federal custody the following day. (AR6; AR14). On March 13, 2006, the ICE completed a Post-Order Custody Review with respect to Nasrallah's continuing detention, and determined that Nasrallah represented a flight risk because he had been a fugitive for more than nine years. (AR1-7).

The ICE Deportation Officer assigned to this case states that the ICE has attempted to obtain Nasrallah's travel documentation for his removal to Lebanon since the day Nasrallah was taken into custody.[3] On or about February 23, 2006, the

---

[2] The Government provided the administrative record relating to this matter as Exhibit A to the Declaration of John G. SILBERMANN ("SILBERMANN Decl."). The record is paginated in the lower right-hand corner. The Court will refer to this administrative record as "AR" with the appropriate page number.

[3] On July 14, 2005, the ICE sent the Lebanese Consulate a request for a travel document with Nasrallah's expired passport. A phone call was made to the Lebanese Consulate on September 13, 2005 checking on the status. On October 27, 2005, the Lebanese Consulate confirmed that they were awaiting a response from

Lebanese Consulate requested Nasrallah's thumbprint and advised the ICE that travel documents would be forthcoming one to two months after the thumbprints were received. Thus, the ICE anticipated an April 2006 removal. (AR4, AR11-12).

In his objections to the Answer, Nasrallah asserts that he was never a fugitive because he had lived at the same address for the past twelve years before he was taken into ICE custody. He also claims that he had a meeting with the ICE to renew his work permit the same week that he was taken into custody. Nasrallah further claims that all the ICE had to do was to call or write petitioner and he would have been willing to depart the United States voluntarily. He admits that he has cooperated with the ICE in their efforts to obtain travel documentation from Lebanon.

Next, Nasrallah asserts that he has a place to live in the United States, that he has close family ties in this country, and that he has his own business to satisfy any employment requirement if released from detention. He also states that he has a Master's degree in History. Thus, he does not present a

---

Lebanon regarding travel document status. The ICE Deportation Officer left telephone messages with the Lebanese Consulate on November 23, 2005, December 19, 27, 2005, and January 4, 10, 2006. On February 23, 2006, the Deportation Officer spoke with the Lebanese Consulate, who advised that petitioner's thumbprint was needed with a travel document application. Thereafter, the Consulate would need a $40.00 money order and a flight itinerary to secure the travel document. (AR4).

flight risk or threat to the community if released from detention pending his removal.

## DISCUSSION

### A.   Standard of Review

Nasrallah seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3).  That section states that the writ will not be extended to a prisoner unless "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  Here, petitioner challenges his continued detention since July 14, 2005.[4]  He claims that his indefinite detention is constitutionally impermissible because he has been denied due process guaranteed under the Fifth Amendment. He relies on Zadvydas v. Davis, 533 U.S. 678 (2001).  He further claims that his continuing detention is unlawful because he does not pose a flight risk or danger to public safety.

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v.

---

[4]   Nasrallah alleges that he was taken into custody by the ICE on July 14, 2005.

5

Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

Respondents contend that Nasrallah's detention from July 14, 2005 through January 14, 2006 was presumptively reasonable, and that after that date, the burden is on petitioner to show that there is no significant likelihood of his removal in the reasonably foreseeable future.  Respondents also state that Nasrallah's removal is imminent based on the Lebanese Consulate's notification to the ICE that travel documents would be issued around April 2006.

**B.  Discussion**

Post-removal-order detention is governed by 8 U.S.C. § 1231(a).  Section 1231(a)(1) requires the Attorney General to attempt to effectuate removal within a 90-day "removal period."

> The removal period begins on the latest of the following:
>
> (i) The date the order of removal becomes administratively final.
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).

Section 1231(a)(6) permits continued detention if removal is not effected within 90 days.  However, the Supreme Court has held

6

that such post-removal-order detention is subject to a temporal reasonableness standard. Specifically, once a presumptively-reasonable six-month period of post-removal-order detention has passed, a resident alien must be released if he can establish that his removal is not reasonably foreseeable. See Zadvydas v. Davis, 533 U.S. 678 (2001); Clark v. Martinez, 543 U.S. 371 (2005).

In addition § 1231(a)(1)(C) provides that the removal period shall be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal subject to an order of removal."

Nasrallah relies on Zadvydas in his petition for release from detention pending his removal. In Zadvydas, resident aliens challenged their detention, pursuant to 8 U.S.C. § 1231, beyond the usual 90-day removal period following a final order of removal. The Supreme Court noted, at the outset, that the question presented to it was one of statutory construction, specifically, "whether this post-removal-period statute authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal." Zadvydas, 533 U.S. at 682 (emphasis added).

Once an alien has effected an entry into the United States, whether lawful or unlawful, temporary or permanent, that alien is

entitled to the protection of the Due Process Clause, which applies to all "persons" within the United States.  533 U.S. at 693-94.  A statute permitting indefinite detention of such an alien "would raise a serious constitutional problem."  533 U.S. at 690.  Accordingly, the Court applied the statutory construction rule of constitutional doubt.  "'[I]t is a cardinal principle' of statutory interpretation, however, that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"  533 U.S. at 689 (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)) (other citations omitted).  The Court concluded that nothing in the history or text of 8 U.S.C. § 1231(a)(6) reveals "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement [such an] alien ordered removed."  533 U.S. at 697.  "Consequently, interpreting the statute to avoid a serious constitutional threat, [the Court] conclude[s] that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."  533 U.S. at 699.[5]

---

[5] In Demore v. Kim, 538 U.S. 510, 527-28 (2003) (upholding the constitutionality of 8 U.S.C. § 1226(c), which mandates pre-removal-order detention, typically lasting less than 90 days, for a limited class of criminal aliens), the Supreme Court distinguished its holding in Zadvydas, emphasizing again that post-removal-order detention for resident aliens for whom removal is "no longer practically attainable" is unconstitutional because

Providing further guidance to lower courts, the Supreme Court advised that a court faced with a resident alien's habeas petition asserting unlawful detention under 8 U.S.C. § 1231(a)(6)

> must ask whether the [post-removal-period] detention in question exceeds a period reasonably necessary to secure removal.  It should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal.  Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute.  In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions.  And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.
>
> ...
>
> [W]e think it practically necessary to recognize some presumptively reasonable period of detention.  ...
>
> We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months.  Consequently, for the sake of uniform administration in the federal courts, we recognize that period.  After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.  And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.  This 6-month presumption, of course, does not mean that every alien not removed must be released

---

it is "indefinite" and "potentially permanent" and does not serve its purported immigration purpose of ensuring the alien's presence for removal.

>after six months.  To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

533 U.S. at 699-701 (citations omitted).

Thus, the alien bears the initial burden of establishing that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," after which the government must come forward with evidence to rebut that showing.  See, e.g., Xi v. U.S. I.N.S., 298 F.3d 832, 839-40 (9th Cir. 2002); Kacanic v. Elwood, 2002 WL 31520362 (E.D. Pa. Nov. 8, 2002); Fahim v. Ashcroft, 227 F. Supp.2d 1359, 1367-68 (N.D. Ga. 2002); Lema v. U.S. I.N.S., 214 F. Supp.2d 1116, 1117-18 (W.D. Wash. 2002), aff'd, 341 F.3d 853 (9th Cir. 2003).

Federal courts disagree as to the extent to which the passage of time can suffice to meet the alien's burden.  Compare Fahim, 227 F. Supp.2d at 1365-68 (mere passage of time insufficient to meet alien's burden of proof), with Kacanic, 2002 WL 31520362 (passage of one year, coupled with inaction of foreign embassy and INS admission that efforts to obtain travel documents have been "fruitless," suffices to meet alien's burden); Seretse-Khama v. Ashcroft, 215 F. Supp.2d 37, 48-54 (D.D.C. 2002) (continued detention for over three years, coupled with eight-month delay since INS last contacted destination country, suffices to meet alien's burden); Lema, 214 F. Supp.2d

at 1118 (where destination country's lack of response to request for travel documents is combined with INS inability to explain silence and absence of any indication that situation may change, continued detention would be unreasonable but, where destination country's failure to respond suggests nothing more than "bureaucratic inertia," removal remains "foreseeable"); Khan v. Fasano, 194 F. Supp.2d 1134, 1136-37 (S.D. Cal. 2001) (where alien has been in post-removal order custody for ten months, and meeting is scheduled with destination country to discuss request for travel documents, delay alone is not sufficient to meet alien's burden; however, alien granted leave to re-file petition in six months' time if his removal has not then been effectuated); Okwilagwe v. INS, 2002 WL 356758 (N.D. Texas March 1, 2002) (passage of eleven months without action by destination country sufficient to meet alien's burden, even where destination country orally promised travel documents "in a few days," but failed to provide them over period of two months).

In addition, in assessing whether an alien has made the required showing, it must be remembered that, while the Supreme Court in Zadvydas emphasized that the expiration of the six-month presumptively-reasonable period of detention did not mandate release, it also stated that as the period of detention grows "what counts as the 'reasonably foreseeable future' conversely shrinks."  533 U.S. at 701.

11

Here, Nasrallah has not suggested that there are any actual institutional barriers to his removal, see Zadvydas, 533 U.S. at 686 (alien Kim Ho Ma was from Cambodia, a country with which the United States has no repatriation agreement), nor has he presented evidence of any individual barriers to his repatriation, see Zadvydas (Zadvydas was a "stateless" individual).  Instead, Nasrallah relies upon the mere passage of time to establish that his removal is not likely in the reasonably foreseeable future.

Under some circumstances, mere passage of time may be sufficient to establish that there is no likelihood of a petitioner's removal within the reasonably foreseeable future. Here, however, Nasrallah has only been detained in post-removal order custody since July 14, 2005, less than one year, and efforts to secure travel documents from Lebanon have been made. Respondents assert that the Lebanese Consulate has assured the ICE that travel documents would be forthcoming around April 2006. While this assertion is not substantiated by independent affidavit, it appears plainly from the record that both the ICE and the Lebanese Consulate have made efforts to obtain travel documents from Lebanon for petitioner's removal.  There is no indication that Lebanon has refused to cooperate with the United States in its removal efforts.  Accordingly, given the efforts by the ICE and the Lebanese Consulate, and the lack of any argument

by Nasrallah that there is no likelihood of his removal to Lebanon, the Court finds that Nasrallah has not met his burden to show that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."

The Court further finds that respondents have shown removal is imminent. Travel documents were expected at the end of April 2006. While this time period has passed by one month, this is not a significant time period to suggest that removal is not reasonably foreseeable in the future. Therefore, under these circumstances, the writ must be denied without prejudice to Nasrallah filing a new action in the event his removal is not effected in the next two months.

Furthermore, the Court finds that petitioner has not been denied procedural due process. Even as an inadmissible alien, Nasrallah is protected by the Fifth Amendment's Due Process Clause, and is entitled to periodic custody reviews pending his removal with respect to conditional release. The Third Circuit's decision in <u>Ngo v. I.N.S.</u>, 192 F.3d 390 (3d Cir. 1994) provides relevant instruction as to the rules governing post-order custody reviews, now set forth in 8 C.F.R. § 241.4(i).[6] The rules

---

[6] The rules evaluated by the Third Circuit in <u>Ngo</u> are no longer in force, but seven elements listed by the court offer guiding principles by which to measure the current review procedures now in effect at 8 C.F.R. § 241.4. For instance, under 8 C.F.R. § 241.4(i), the Director of the Headquarters Post-

specified the following: (1) advance written notice to alien of an opportunity to present information supporting release; (2) right to representation at the review; (3) right to an annual personal interview; (4) written explanations for a custody decision must be provided; (5) an opportunity for administrative review must be given; (6) custody reviews should occur every six months; and (7) a refusal to presume continued detention based on criminal history.  Ngo, 192 F.3d at 399.  The Third Circuit held that these provisions, if conscientiously applied, gave reasonable assurance of fair consideration of a petitioner's application for conditional release pending removal.  Id.

---

Order Detention Unit ("HQPDU") is required to designate a two-person panel to make recommendations on whether an alien should be released or detained.  This recommendation must be unanimous.  The initial review, and at the beginning of subsequent reviews, the review panel examines the alien's records.  If the panel does not recommend release, or if the HQPDU Director rejects a recommendation for release, the alien shall be personally interviewed by the review panel.  The alien may have a representative at this interview, subject to reasonable security concerns, and he may submit any information he believes may be pertinent in securing his release.

    Under 8 C.F.R. § 241.4(d), an alien may obtain a conditional release from detention by showing that his release will not pose a significant risk of flight and danger to the community, to the safety of others or to property pending removal.  Under 8 C.F.R. § 241.4(e), an alien is eligible for release if th review panel or the HQPDU Director find that the following criteria are met: (1) travel documents are not available or immediate removal is otherwise not practicable or not in the public interest; (2) the alien is presently a non-violent person; (3) the alien is likely to remain non-violent if released; (4) the alien is not likely to pose a threat to the community if released; (5) the alien is not likely to violate the conditions of release; and (6) the alien does not pose a significant flight risk if released.

Here, the administrative record shows that Nasrallah received a custody review in March 2006, consisting of an examination of petitioner's file and information that petitioner submitted to the BICE reviewing officials. (AR1-7). A decision to continue detention was rendered on March 13, 2006 based on the fact that Nasrallah was a fugitive for over nine years and appeared to pose a significant flight risk.[7] Another custody review has not been scheduled since the Lebanese Consulate has informed the ICE that petitioner's travel documents are forthcoming and removal to Lebanon is imminent.

Thus, having carefully reviewed the record, the Court finds that Nasrallah is not entitled to any greater custody reviews than that which the BICE has already provided him. Nasrallah received a meaningful custody review in which he was considered for conditional release. There is no indication that Nasrallah's removal to Lebanon will not be expeditiously accomplished once

---

[7] The Court notes that Nasrallah does not have a criminal history that would tend to show that he would be a potential danger to the community. However, there is the factual dispute that he poses a flight risk because he was a fugitive for nine years. It is not entirely clear that the address on file with the ICE was the same address at which Nasrallah resided after his notice of removal dated December 26, 1996. It appears that he was apprehended by the New York City Fugitive Operation Unit in July 2005 based on a referral from the Fugitive Case Management Unit, as part of the Alien Flight School Program, that Nasrallah was a pilot with FAA certification. When apprehended at his apartment, Nasrallah had three computers, two safes, flight simulation program, flight simulation equipment, maps and flight plans. (AR14). These facts would support a decision to continue detention pending removal.

15

petitioner's travel documents are forwarded.  Finally, the Court is not inclined to find the ICE decision to continue custody to be anything other than an individualized determination of Nasrallah's status.

Accordingly, the Court concludes that Nasrallah's continued detention does not violate due process and is not constitutionally impermissible at this juncture because he has not demonstrated that his removal to Lebanon is not reasonably foreseeable in the near future and because Nasrallah has been afforded an individualized custody review.  Therefore, the petition will be denied without prejudice to allow Nasrallah the opportunity to reassert his claims regarding continued detention if he is not removed in the time frame represented by respondents, or if the ICE does not provide adequate due process in the future.

## IV. CONCLUSION

For the reasons set forth above, this petition will be denied, without prejudice to Nasrallah bringing a new petition if the Government fails to remove petitioner in the next several months as anticipated by respondents, or if the Government fails to provide Nasrallah an adequate custody review in the future

16

that comports with the due process principles set forth in this Opinion.  An appropriate order follows.


    /s/ Faith S. Hochberg
United States District Judge

Dated:  May 31, 2006